UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------------------X

ABU SIDDIQUE

                               Plaintiff,

               -against-

CITY OF NEW YORK, Officer Honolito Inoa and
John Doe and Janes Doe Officers and Detectives 1-10,
Whose true identifies are unknowns, in their individual and official
capacity
                               Defendants.
----------------------------------------------------------------------X

**PLAINTIFF'S FIRST
AMENDED COMPLAINT**

**JURY DEMAND
REQUESTED**

22-cv-03807 (HG)

       Plaintiff ABU SIDDIQUE, through his attorneys, DAVIS, NDANUSA, IKHLAS &

SALEEM LLP, as and for his complaint against Defendants, respectfully alleges as follows:

## NATURE OF THE ACTION

1.  Plaintiff brings this civil rights action against the City of New York, the New York City

    Police Department officer Hinolito Inoa unknown Officers and Detectives 1-10, whose true

    identities are unknown, for the unjustifiable arrest by the defendants. Plaintiff was deprived

    of his federal constitutional and state constitutional and common law rights when the

    defendants caused the unlawful arrest of plaintiff and confined the plaintiff. Plaintiff seeks

    declaratory relief and/or damages to redress Defendants' violations of, *inter alia*,

    negligence, negligent hiring, training and supervision, false arrest and false imprisonment,

    assault and battery, failure to intervene, emotional distress, violation of civil rights,

    violation of **42 U.S. 1983**, and violation of New York State Constitution, Monell Claim.

## JURISDICTION AND VENUE

2.  This is a civil rights action seeking damages for the Defendants' violations of Plaintiff's

rights, privileges, and immunities under the United States Constitution, as amended, and the Civil Rights Act of 1871, 42 U.S.C. § 1983 and 1988, Article 1 Section 11 of the New York Constitution.  Plaintiff further invokes the pendent jurisdiction of this Court in accordance with 28 U.S.C. §§ 1331, 1343(a)(3) & (4), and 1367 (a).  As the unlawful acts complained of herein occurred in the Borough of Manhattan, County of New York, City and State of New York which is within the Southern District of New York, venue is proper within this District pursuant to 28 U.S.C. § 1391(b) and (c).

3. Jurisdiction of this Court is proper under 42 U.S.C. § 1983, 1988 and 28 U.S.C. § 1343(3), 28 U.S.C. § 1331 and 28 U.S.C. §200oe through 2000e(15).

## PARTIES

4.  At all times mentioned herein, Plaintiff Abu Siddique (herein, "Siddique") is a natural person over eighteen years of age and maintains residence at 902 41st Street, Apt D11, Brooklyn, NY 10457.

5.  At all times hereinafter mentioned, Defendant CITY OF NEW YORK (herein, "CITY") was and still is a municipal corporation existing under and by virtue of the laws of the State of New York.

6. At all times hereinafter, Officer Hinolito Inoa is a member of the NYPD in the 75th precinct with a business address in the county of Kings.

7. At all times hereinafter mentioned, Defendants JOHN DOE OFFICERS and DETECTIVES #1-10, the names being fictitious but who are intended to be NYPD officers, were employees of NYPD who aided in the unlawful arrest of the plaintiff on March 30, 2021, and were employed by and acting pursuant to their authority, which was given to them by the defendants CITY and/or NYPD, as police officers.

8.  At all times hereinafter mentioned, Defendants JOHN DOE OFFICERS and DETECTIVES #1-10, the names being fictitious but who are intended to be NYPD officers who aided in the unlawful arrest of the plaintiff on March 30, 2021, were acting under color of law and within the scope of their employment as police officers employed by the NYPD.

## NOTICE OF CLAIM

9.  That prior to the commencement of this action and Plaintiffs duly filed with the Comptroller's office of The City of New York a Notice of Claim setting forth the time when and place where the occurrence which is the subject of this lawsuit happened, the nature and extent of the injuries, damages sustained, and the amount claimed.

10.  Such claim was presented within ninety (90) days after the cause of action herein accrued.

11.  On December 8, 2021, Defendants conducted an examination of Plaintiff pursuant to Section 50-H of the New York General Municipal Law.

12.  More than thirty (30) days have elapsed since such presentation of said claims and Defendants CITY and NYPD have failed and neglected to make any payment of such claim and cause of action.

## STATEMENT OF FACTS

13.  That on March 30, 2021, Siddique was working at his business Fix N Colors located at 1251 Fulton Street, Brooklyn, NY when an undercover police officer entered the store and inquired about selling a phone.

14.  Pursuant to this sale, Siddique took the phone's IMEI number and checked it to ensure that it was not stolen, lost, blacklisted, or illegal in any sense. The phone ran in the system and was completely clean. Specifically, it was not stolen.

15. Siddique proceeded to ask for identification (herein, "ID") to sell the phone, which the undercover police officer did not provide. Subsequently, Siddique refused to buy the device without ID.

16. Later that day, the same undercover police officer returned with another undercover police officer who had ID to sell the aforementioned phone. At first, Siddique declined the sale, but the officers were persistent about selling the phone. Siddique made a copy of the provided ID, bought the phone, and provided payment to the undercover officers.

17. That on March 30, 2021, shortly after buying the phone, Siddique was arrested at 1251 Fulton Street, Brooklyn, NY by uniformed officers incident to an undercover operation during which he was accused of possession of stolen property pursuant to PL 165.40. Siddique was arrested under arrest #K21609133. At the time of the arrest, the police officers took the copy of the ID, the phone, and withheld the provided payment.

18. After being detained in a holding cell, Siddique was questioned by two undercover police officers regarding information about individuals selling drugs around his business. Once released, Siddique was given a desk appearance ticket to appear on June 8, 2021 for arraignment. His case number is CR-008366-21KN.

19. That during his questioning Siddique was asked to collaborate with and act as an informant for the NYPD in exchange for his charges being dropped.

20. That Siddique refused the offer to act as an informant and his charges where therefore prosecuted.

21. That on June 8, 2021 Siddique was arraigned and the matter was adjourned to July 28, 2021.

22. That on July 28, 2021, the charges against Siddique were dismissed.

## AS AND FOR A FIRST CAUSE OF ACTION FOR
## NEGLIGENCE

23.  Plaintiff repeats and alleges each and every allegation contained in the above paragraphs as though fully set forth herein.

24.  That on or about March 30, 2021, and at all times hereinafter mentioned, the defendants had a duty of care with respect to the performance of their duties, obligations, and responsibilities so that they would not pose or create an unreasonable or illegal risk of harm or injury to others, and particularly the plaintiff herein.

25.  That on or about March 30, 2021, and at all times hereinafter mentioned, said defendants were negligent, reckless, and careless.

26.  That the aforesaid events took place as a result of the negligence, recklessness, and carelessness of the defendants CITY and NYPD, their agents, employees, and all others acting on their behalf, in the following manner but not limited thereto: in failing to avoid the happening of the incident involved herein; in failing to properly train and supervise its police officers, undercover plain clothes officers, and other agents and/or employees; in failing and omitting to take appropriate precautions for the protection of the plaintiff when he was detained and/or taken into custody; in failing and omitting to adhere to the modes, practices, customs and procedures prescribed for police officers undertaking to detain an individual and/or make an arrest in the course of their duties; in deviating from the rules and regulations made and provided in detaining an individual and/or effecting an arrest; in the inadequate education, and training; in hiring and retaining incompetent and unfit police officers; in failing to oversee, supervise, and monitor their conduct and, in particular, their conduct and actions with respect to the plaintiff herein; in causing, permitting and allowing said police officers to illegally and wrongfully detain, arrest, falsely imprison, threaten and

embarrass the plaintiff; in falsely arresting, imprisoning, detaining, questioning plaintiff on and for crimes he did not commit; in subjecting plaintiff to the pain, humiliation, and embarrassment of being falsely arrested.

27.  That on or about March 30, 2021, and at all times hereinafter mentioned, said defendants breached their duties of care, through their negligent, reckless, and careless actions as aforementioned.

28.  That at all times hereinafter mentioned, the aforementioned actions and conduct of defendants were extreme, outrageous, and wholly out of accord with acceptable police practices and custom.

29.  That as a direct and proximate result of the foregoing negligence, plaintiff has been damaged in the sum of an amount to be determined at trial.

<u>**AS AND FOR A SECOND CAUSE OF ACTION FOR
NEGLIGENT HIRING, TRAINING, AND SUPERVISION**</u>

30.  Plaintiff repeats and alleges each and every allegation contained in the above paragraphs as though fully set forth herein.

31.  The actions of defendants CITY and NYPD, through its agents, servants and/or employees including Officer Inoa and JOHN DOE OFFICERS and DETECTIVES #1-10, the names being fictitious but whom are intended to be NYPD officers who aided in the unlawful arrest of plaintiff on March 30, 2021, heretofore described herein constitutes negligence in that defendants CITY and Officers were negligent in failing to exercise the proper degree of care and caution so as to prevent the occurrence complained of herein; and in other ways acting in a reckless, careless, negligent and hazardous manner.

32.  That defendants CITY and NYPD, their agents, servants and/or employees were negligent, careless and reckless in failing to properly screen and investigate personnel before hiring;

in that they negligently and improperly trained Officer Inoa and JOHN DOE OFFICERS

and DETECTIVES #1-10, the names being fictitious but whom are intended to be NYPD

officers who aided in the unlawful arrest of plaintiff on March 30, 2021; in that they failed

and neglected to provide proper and adequate supervision of its agents, servants and/or

employees, including Officer Inoa and JOHN DOE OFFICERS and DETECTIVES #1-10,

the names being fictitious but whom are intended to be NYPD officers who aided in the

unlawful arrest of plaintiff on March 30, 2021; in that they caused, permitted and allowed

plaintiff to be falsely arrested; and in that they failed to take reasonable and prudent

measures to prevent such occurrences as herein complained of from taking place.

33.  That plaintiff's injuries were caused solely and wholly by the negligence of the defendants

herein, without any negligence on the part of the plaintiff contributing thereto.

34.  That solely as a result of the foregoing inadequate, insufficient, and improper training,

supervision, hiring and management of its employees, the plaintiff was caused to suffer

extreme emotional distress and trauma, was incapacitated from his usual duties and

vocations for an extended period of time and since some of his injuries are believed to be

permanent and lasting in their effects, he will continue to suffer similar mental distress and

damages in the future.

35.  That by reason of the foregoing, plaintiff has been damaged in an amount to be determined

at trial.

## AS AND FOR A THIRD CAUSE OF ACTION FOR
## FALSE ARREST AND FALSE IMPRISONMENT

36.  Plaintiff repeats and alleges each and every allegation contained in the above paragraphs

as though fully set forth herein.

37. That on March 30, 2021 at approximately 8:05 p.m., Plaintiff Siddique was lawfully and properly on the premises known as 1251 Fulton Street, Brooklyn, NY when defendants CITY and NYPD through its agents, servants, employees, including Officer Inoa and JOHN DOE OFFICERS and DETECTIVES #1-10, the names being fictitious but whom are intended to be NYPD officers who aided in the unlawful arrest of plaintiff on March 30, 2021, unlawfully and wrongfully detained, arrested, imprisoned and removed plaintiff within the scope of their employment with the NYPD.

38. That the aforesaid arrest and imprisonment was malicious, unlawful, and not based upon a proper warrant, probable cause or legal cause, excuse or justification to seize the person and/or property of the plaintiff and was therefore an unlawful arrest and detainment.

39. That defendants CITY, through its agents, servants, and/or employees including Officer Inoa and JOHN DOE OFFICERS and DETECTIVES #1-10, who at the time were police officers of NYPD, acted in bad faith and without probable cause in committing the aforesaid arrest and imprisonment of plaintiff.

40. At the time of his unlawful arrest and imprisonment, plaintiff had not committed or attempted to commit any illegal act.

41. At the time of plaintiff's unlawful arrest, detainment and/or imprisonment, defendants knew or should have known, through exercise of proper procedure and reasonable investigation, that the aforementioned arrest and imprisonment were false and without probable cause.

42. The aforesaid false arrest and imprisonment caused plaintiff to suffer emotional and psychological distress, anguish, anxiety, fear, humiliation, loss of freedom, loss of wages, legal expenses, and damage to his reputation.

43.  That by reason of the foregoing, plaintiff has been damaged in an amount to be determined at trial.

## AS AND FOR A FOURTH CAUSE OF ACTION FOR
## ASSAULT AND BATTERY

44.   Plaintiff repeats and alleges each and every allegation contained in the above paragraphs as though fully set forth herein.

45.  Defendants CITY, through its agents, servants, and/or employees including Officer Inoa and JOHN DOE OFFICERS and DETECTIVES #1-10, intentionally, willfully, and maliciously assaulted plaintiff in that they had the real or apparent ability to cause imminent harmful and/or offensive bodily contact and intentionally did a violent and/or menacing act which threatened such contact to the plaintiff, and that such acts caused apprehension of such contact in the plaintiff.

46.  Defendants CITY, through its agents, servants, and/or employees including Officer Inoa and JOHN DOE OFFICERS and DETECTIVES #1-10, intentionally, willfully, and maliciously battered plaintiff with the intention of causing harmful and/or offensive bodily contact to the plaintiff and caused such battery.

47.  The aforesaid assault and battery of the plaintiff was without excuse or privilege and was in no way justified in self-defense or otherwise.

48.  Defendants were at all times agents, servants, and employees acting with the scope of their employment by the CITY, which are therefore responsible for their conduct.

49.  The CITY, as the employer of the officer defendants, is responsible for their wrongdoing under the doctrine of *respondeat superior*.

50.  That by reason of the foregoing, plaintiff has been damaged in an amount to be determined at trial.

## AS AND FOR A FIFTH CAUSE OF ACTION FOR
## FAILURE TO INTERVENE

51.  Plaintiff repeats and alleges each and every allegation contained in the above paragraphs as though fully set forth herein.

52.  Defendants had an affirmative duty to intervene on behalf of plaintiff, whose constitutional rights were being violated in their presence by other officers.

53.  Defendants failed to intervene to prevent the unlawful conduct described herein.

54.  As a result of the foregoing, plaintiff's liberty was restricted for an extended period of time, he was put in fear of his safety, and he was humiliated and subject to other physical constraints.

55.  Defendants were at all times agents, servants, and employees acting with the scope of their employment by the CITY, which are therefore responsible for their conduct.

56.  The CITY, as the employer of the officer defendants, is responsible for their wrongdoing under the doctrine of *respondeat superior*.

57.  That by reason of the foregoing, plaintiff has been damaged in an amount to be determined at trial.

## AS AND FOR AN SIXTH CAUSE OF ACTION FOR
## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

58.  Plaintiff repeats and alleges each and every allegation contained in the above paragraphs as though fully set forth herein.

59.  The aforementioned actions of the defendants were so outrageous, malicious, and shocking that it exceeded all reasonable bounds of decency tolerated by the average member of the community.

60.  Defendants acted with the desire and intent to cause plaintiff emotional distress or acted under circumstances known to them which made it substantially certain that they would cause such emotional distress.

61.  Defendants acted with utter disregard of the consequences of their actions.

62.  As a result, plaintiff was caused to suffer emotional distress.

63.  That by reason of the foregoing, plaintiff has been damaged in an amount to be determined at trial.

### AS AND FOR A SEVENTH CAUSE OF ACTION FOR VIOLATION OF CIVIL RIGHTS

64. Plaintiff repeats and alleges each and every allegation contained in the above paragraphs as though fully set forth herein.

65.  The actions of defendants heretofore described constitutes an unlawful arrest, detention, imprisonment, assault and battery, which deprived plaintiff of his rights, privileges, and immunities as granted under the United States Constitution, Amendments One, Four, Five and Fourteen, the New York State Constitution, the Civil Rights Act, 42 U.S.C. §§ 1981, 1983, 1985, 1986 and 1988, and the complained of conduct was either the result of an official policy or unofficial custom, including but not limited to, the policies and customs concerning the hiring, training, supervision, retention and discipline of the CITY and NYPD's agents, servants and/or employees.

66.  That the defendants established a custom, policy and/or practice of encouraging, approving and/or tolerating the use by the NYPD of acts of misconduct against civilians and subsequent attempts to conceal such actions by failing to adequately train, supervise and discipline its agents, employees, and officers.

67.  That the defendants were deliberately indifferent to the use of improper procedures in the detention and arrest of civilians and established a custom or policy and/or practice of encouraging, approving and/or tolerating the use of said improper procedures by the NYPD and subsequent attempts to conceal such actions by failing to adequately train, supervise and discipline their agents, servants and/or officers.

68.  The defendants have deprived plaintiff of his liberty in violation of his Civil and Constitutional rights as set forth in the United States Constitution, 42 U.S.C. § 1983 and Constitution of the State of New York.

69.  That the defendants' actions were undertaken under color of law and would not have existed but for said defendants' use of their official power.

70.  The defendants conspired with each other and acted in concert to discriminate against and deprive the plaintiff of his Constitutional and Civil rights.

71.  That the supervisors and policy making officers, defendants, CITY, and defendants, Officer Inoa and JOHN DOE OFFICERS and DETECTIVES #1-10, the names being fictitious but whom are intended to be NYPD officers who aided in the unlawful arrest of plaintiff on March 30, 2021, as a matter of policy are deliberately indifferent to said practices and have failed to take steps to terminate the herein above detailed practices and have failed to discipline or otherwise properly supervise the individuals engaged in such practices.

72.  The defendants CITY failed to properly or effectively train its agents, servants and/or employees, including Officer Inoa and JOHN DOE OFFICERS and DETECTIVES #1-10, the names being fictitious but who are intended to be NYPD officers who aided in the

unlawful arrest of plaintiff on March 30, 2021, with regard to proper constitutional and

statutory limits on the exercise of their authority, and such failure continues to this day.

73.  The defendants CITY sanctioned the policy and practices heretofore described through

their deliberate indifference to the effects of such policy and practices upon the

constitutional rights of the plaintiff and others similarly situated.

74.  The defendants' motivations were in contravention of the United States Constitution and

the Constitution of the State of New York.

75. By reason of the foregoing, plaintiff has been damaged and suffered severe emotional

distress and emotional harm as a result of these deprivations of constitutional and civil

rights.

76.  That by reason of the foregoing, plaintiff has been damaged in an amount to be

determined at trial.

## AS AND FOR AN EIGTH CAUSE OF ACTION FOR VIOLATION OF 42 U.S.C. 1983

77. Plaintiff repeats and alleges each and every allegation contained in the above paragraphs

as though fully set forth herein.

78.  As a direct and proximate result of the defendants' actions as detailed above, plaintiff

was deprived of rights, privileges, and immunities secured to him under the constitution

and the law of the United States, including, but not limited to, his rights under the Fourth

and Fourteenth Amendments and 42 U.S.C. § 1983.

79. Defendants also willfully and intentionally subjected Plaintiff to the criminal process

without probable cause to believe that Plaintiff could be successfully prosecuted through

the coercion of a witness leading to the making of false, contradictory or materially

misleading statements and the destruction of evidence, and did so without a reasonable basis to believe that such conduct was appropriate, reasonable, lawful or necessary.

80. Defendants willfully and intentionally seized, searched, detained and arrested Plaintiff without probable cause, and without reasonable basis to believe such cause existed.

81. By doing so, the Defendants, individually and collectively, subjected the Plaintiff to unlawful search and seizure, denial of due process and a fair trial, malicious prosecution and abuse of process, and aided and abetted in violation of Plaintiff's rights under the Fourth and Fourteenth Amendments of the United States Constitution.

82. The Defendant Officers acted under pretense and color of state law and in their individual and official capacity and within the scope of their respective employments as NYPD officers. Said acts by the NYPD officers was beyond the scope of their jurisdiction, without authority of law and in abuse of their powers, and said Defendants acted willfully, knowingly and with the specific intent to deprive the Plaintiff of his constitutional rights secured by 42 U.S.C. § 1983 and by the Fourth and Fourteenth Amendments to the United States Constitution.

83. By reason of the foregoing, plaintiff has been damaged and suffered severe emotional distress and emotional harm as a result of these deprivations of constitutional and civil rights.

84. That by reason of the foregoing, plaintiff has been damaged in an amount that exceeds the jurisdictional limitations of all lower courts which would otherwise have jurisdiction.

## AS AND FOR A TENTH CAUSE OF ACTION FOR MALICIOUS PROSECUTION

85. Plaintiff re-alleges each of the proceeding causes of action as though fully set forth in each of the subsequent causes of action.

86. The acts and conduct of the defendants constitute malicious prosecution under the laws of the United States Constitution, State of New York and New York State common law.

87. That Defendant CITY and Defendant Officers did commence and continued a criminal action against Plaintiff.

88. There was an absence of probable cause for the criminal proceeding against plaintiff and for each of the charges for which he was prosecuted.

89. That the criminal action and prosecution was commenced without probable cause or belief that said action would be successful by Defendants fabricating allegations, manipulating the alleged victim, and destroying evidence.

90. That the criminal action was therefore commenced with actual malice.

91. The prosecution and criminal proceedings terminated in plaintiff's favor on the aforementioned dates.

92. That as a result of the arrest and prosecution, Plaintiff was deprived of his freedom and liberty sufficient to implicate plaintiff's Fourth Amendment and Fourteenth Amendment rights.

93. All of the foregoing occurred without any fault or provocation on the part of the Plaintiff.

94. Defendants, their officers, agents, servants, and employees were responsible for Plaintiff's detention and imprisonment during this period of time. Defendant CITY, as employer of each of the Defendants Officers, is responsible for their wrongdoing under the doctrine of *respondeant superior*.

95. The Defendant Officers acted with a knowing, willful, wanton, grossly reckless, unlawful, unreasonable, unconscionable, and flagrant disregard of the Plaintiff's rights, privileges, welfare, and well-being by fraud, and other police conduct undertaken in bad faith and are

therefore guilty of egregious and gross misconduct toward Plaintiff.

96. That by reason thereof, the individual Defendant has violated rights and caused Plaintiff to suffer emotional, physical and economic injuries, mental anguish, incarceration and deprivation of liberty, and the loss of his constitutional rights.

97. As a direct and proximate result of the misconduct, abuse and prosecution detailed above, Plaintiff sustained the damages hereinbefore stated to be determined at trial.

## AS AND FOR A NINTH CAUSE OF ACTION FOR
## MONELL

98. Plaintiff repeats and alleges each and every allegation contained in the above paragraphs as though fully set forth herein.

99. Upon information and belief, defendant CITY by its agent NYPD has permitted and tolerated a pattern and practice of unlawful arrest, detention, imprisonment, assault, and battery, which deprived plaintiff of his rights.

100. All of the acts and omissions by the individual Defendants described above were carried out in his capacity as a police officer and pursuant to overlapping policies and practices of the CITY which were in existence at the time of the conduct alleged herein and were engaged in with the full knowledge, consent, and cooperation and under the supervisory authority of the defendant CITY and its agency, the NYPD.

101. More specifically, this policy or practice involves the false arrest of persons with the intent of turning the innocent immigrant arrestees into informants in exchange for charges being dropped.

102.     That upon information and belief, the targeted arrestees in these policies are non-citizens, whose arrest impacts their immigration status and therefore incentivizes them to cooperate and act as informants for the NYPD.

103.     Defendant CITY by their policy-making agents, servants and employees, authorized, sanctioned and/or ratified the individual police defendants' wrongful acts; and/or failed to prevent or stop those acts; and/or allowed or encouraged those acts to continue.

104.     The aforementioned customs, practices, procedures and rules of the CITY and the NYPD include, but are not limited to, the following unconstitutional practices:

    a.  Arresting persons known to be innocent in order to meet "productivity goals" (i.e., arrest quotas);

    b.  Falsely swearing out criminal complaints, and/or lying and committing perjury during sworn testimony

        i.  in order to protect other officers; and/or

        ii.  in order to meet said productivity goals; and/or

        iii.  in order to receive overtime compensation; and/or

    c.  Arresting persons known to be innocent in the face of clear evidence to disprove the alleged reason for the arrest;

    d.  Arresting persons known to be innocent and subsequently questioning or investigating the arrestee for purposes and reasons unrelated to the purported arrest in order to retain the arrestee as an informant;

    e.  Failing to supervise, train, instruct and discipline police officers and encouraging their misconduct;

 f. Discouraging police officers from reporting the corrupt or unlawful acts of other police officers;

 g. Retaliating against officers who report police misconduct; and

 h. Failing to intervene to prevent the above-mentioned practices when they reasonably could have been prevented by a supervisor or other agent or employee of the NYPD.

105. Upon information and belief, the CITY and NYPD has maintained a system of review of police officer conduct which is so untimely and cursory as to be ineffective and which permits and tolerates aforementioned unlawful acts and deprivations of one's rights.

106. The existence of aforesaid unconstitutional customs and policies may be inferred from repeated occurrences of similar wrongful conduct, as documented in the following civil rights actions filed against the CITY:

 a. Schoolcraft v. City of New York, 10-CV-6005 (RWS) (S.D.N.Y.) (police officer who exposed a precinct's policies and practices of illegal quotas for the issuance of summonses and arrests, falsifying evidence and suborning perjury alleges he was arrested and committed to a psychiatric facility in retaliation for exposing said policies and practices to the press);

 b. Long v. City of New York, 09-CV-6099 (AKH) (S.D.N.Y.); People v. Pogan, 06416- 2008 (Sup. Ct., N.Y. Co.) (officer who purposefully swore out a false complaint and used excessive force is convicted of falsifying police records and was prosecuted for recklessly using physical force; the plaintiff was engaged in expressive conduct, to wit, riding in a Critical Mass bicycle ride, when he was assaulted by the officer);

 c. Lin v. City of New York, 09-CV-1936 (PGG) (S.D.N.Y.) (officers arrest person lawfully photographing an arrest of a bicyclist in Times Square and swear out a criminal complaint whose facts are contradicted by video evidence; officers also arrest a bystander after refusing an unlawful order to produce identification)

 d. Colon v. City of New York, 09-CV-0008 (E.D.N.Y.) In an Order dated November 25, 2009, which denied the CITY's motion to dismiss on Iqbal/Twombly grounds, wherein the police officers at issue were fired and prosecuted for falsifying evidence in a purported buy-and-bust operation, the Honorable District Court Judge Weinstein wrote:

> Informal inquiry by the court and among the judges of this court, as well as knowledge of cases in other federal and state courts, has revealed anecdotal evidence of repeated, widespread falsification by arresting police officer of the New York City Police Department. Despite numerous inquiries by commissions and strong reported efforts by the present administration – through selection of candidates for the police force stressing academic and other qualifications, serious training to avoid constitutional violations, and strong disciplinary action within the department – there is some evidence of an attitude among officers that is sufficiently widespread to constitute a custom or policy by the city approving illegal conduct of the kind now charged.

e. Callaghan v. City of New York, 07-CV-9611 (PKC) (S.D.N.Y.) (officers accused of falsifying evidence and retaliatory arrests of bicyclists engaged in expressive conduct, to wit, riding in Critical Mass bicycle rides after the 2004 Republican National Convention);

f. Williams v. City of New York, 06-CV-6601 (NGG), 2009 U.S. Dist. LEXIS 94418 (E.D.N.Y.) (officers arrest plaintiff during a "vertical patrol" of a public housing project without probable cause and despite evidence that he had a legitimate reason to be on the premises);

g. Dunlop v. City of New York, 06-CV-0433 (RJS), 2008 U.S. Dist. LEXIS 38250 (S.D.N.Y.) (bystander arrested outside the 2004 Republican National Convention while observing arrests occurring in public; alleges that police destroyed exculpatory evidence by deleting portions of a video which contradict sworn criminal complaint);

h. MacNamara v. City of New York, 04-CV-9216 (RJS) (JCF) (S.D.N.Y.) (evidence of perjured sworn statements systematically provided by officers to attempt to cover-up or justify unlawful mass arrests of approximately 1800 people has been and continues to be developed in the consolidated litigation arising out of the 2004 Republican National Convention);

i. McMillan v. City of New York, 04-CV-3990 (FB) (RML) (E.D.N.Y.) (officers fabricated evidence and used excessive force against an African-American man in Kings County and initiated drug charges against him, despite an absence of any quantum of suspicion);

j. Avent v. City of New York, 04-CV-2451 (CBA) (CLP) (E.D.N.Y.) (same);

k. Smith v. City of New York, 04-CV-1045 (RRM) (JMA) (E.D.N.Y.) (same);

l. Powers v. City of New York, 04-CV-2246 (NGG), 2007 U.S. Dist. LEXIS 27704 (E.D.N.Y.) (police officer alleges unlawful retaliation by other police officers after testifying about corruption within the NYPD);

m. Kunstler v. City of New York, 04-CV-1145 (RWS) (MHD) (S.D.N.Y.) (group of peaceful anti-war protestors arrested without probable cause and questioned by NYPD about their political beliefs; photographic and video surveillance of the protestors taken due to plaintiff's political beliefs);

n.  Allen v. City of New York, 03-CV-2829 (KMW) (GWG) (S.D.N.Y.) (police surround and arrest groups of persons lawfully protesting against the policies of the World Economic Forum; numerous police officers falsely swear that they gave orders to disperse; and, even if they had given such orders, the police provided no place of egress for the protestors to disperse);

o.  Dotson v. City of New York, 03-CV-2136 (RMB) (S.D.N.Y.) (officers arrest and use excessive force against a candidate for City Council for trespassing in his own residential building);

p.  Nonnemann v. City of New York, 02-CV-10131 (JSR) (AJP), 2004 U.S. Dist. LEXIS 8966 (S.D.N.Y.) (former NYPD lieutenant alleging retaliatory demotion and early retirement after reporting a fellow officer to IAB and CCRB for the officer's suspicionless, racially-motivated stop-and-frisk of a group of Hispanic youth);

q.  Richardson v. City of New York, 02-CV-3651 (JG) (CLP) (E.D.N.Y.) (officers fabricated evidence, including knowingly false sworn complaints, and used excessive force against an African-American man in Kings County and initiated drug charges against him, despite an absence of any quantum of suspicion);

r.  Barry v. New York City Police Department, 01-CV-10627 *2 (CBM), 2004 U.S. LEXIS 5951 (S.D.N.Y.) (triable issue of fact where NYPD sergeant alleged retaliatory demotion and disciplinary charges in response to sergeant's allegations of corruption within her unit and alleged that the NYPD had an "unwritten but pervasive custom of punishing officers who speak out about police misconduct and encouraging, if not facilitating, silence among officers");

s.  Taylor v. City of New York, 01-CV-5750 (ILG) (MDG) (E.D.N.Y.) (same as Richardson, except without the excessive force; judge at the criminal trial acquitting Mr. Taylor noted, on the record, that he had "significant doubt" about the truthfulness of the officers who testified);

t.  Walton v. Safir, 99-CV-4430 (AKH), 122 F.Supp.2d 466 (S.D.N.Y. 2000) (factual findings after trial that a 12-year veteran of NYPD was terminated in retaliation for criticizing the racially-motivated policies of the NYPD's Street Crime Unit and for alleging that such policies led to the NYPD shooting death of Amadou Diallo);

u.  White-Ruiz v. City of New York, 93-CV-7233 (DLC) (MHD), 983 F.Supp. 365, 380 (S.D.N.Y. 1997) (holding that the NYPD had an "unwritten policy or practice of encouraging or at least tolerating a pattern of harassment directed at officers who exposed instances of police corruption");

v.  Sorlucco v. New York City Police Department, 89-CV-7225 (CCH), 888 F.2d 4 (2d Cir. 1989) (former officer entitled to trial on issue of whether she was re-assigned and then terminated after reporting that a fellow officer had raped her); and

w.  Kaufman v. City of New York, 87-CV-4492 (RO), 1992 U.S. Dist. LEXIS 14049 (S.D.N.Y.) (bystander arrested for observing an unlawful arrest in public, requesting the officer's badge number, and telling the officer that he planned to file a report about the arrest).

107.     Furthermore, the existence of the aforesaid unconstitutional customs and policies,

specifically with regard to "productivity goals," may be further inferred from the

following:

a.  Deputy Commissioner Paul J. Browne has repeatedly admitted that NYPD
    commanders are permitted to set "productivity goals."

b.  An NYPD transit lieutenant was captured on tape telling officers to make more
    arrests to meet a captain's order and do more work if they want overtime
    assignments. "All they care about is ... summonses and arrests and 250s," Lt. Janice
    Williams said, using police jargon for the NYPD Stop, Question and Frisk reports.
    She added, "The bottom line is everybody's individual activity is being looked at.
    "Later in the recording - made during a roll call in 2010 at Transit District 34 in
    Coney Island - she said only officers with "good productivity" will get the
    opportunity to work overtime. She also said Capt. James Sheerin wanted every
    officer to make at least one arrest per month - up from the previous order of one
    every three months - because crime had spiked and arrest totals were lower than
    other transit districts."

c.  NYPD Officer Adil Polanco has asserted that his command, the 41st Precinct,
    regularly requires officer to make at least "one arrest and twenty summonses" per
    month. P.O. Polanco's allegations were confirmed by an audiotape obtained by the
    media. The contents of the tape reveal that these quotas are enforced through
    coercion and threats of job loss, to wit, a patrol supervisor at the 41st Precinct is
    overheard saying: "If you think one and 20 is breaking your balls, guess what you'll
    be doing. You're gong (sic) to be doing a lot more, a lot more than what they're
    saying." The tape also reveals that another patrol supervisor chimed in and told the
    officers: "Next week, 25 and one, 35 and one, and until you decide to quit this job
    and go to work at a Pizza Hut, this is what you're going to be doing till (sic) then."

d.  The New York Daily News obtained and published two (2) internal memos, which
    were posted inside the roll-call room at the NYPD's 77th Precinct. The memos
    specifically instructed officers about "number of tickets to give drivers for cell
    phone, seat belt, double-parking, bus stop, tinted windows and truck route
    violations" they were expected to issue. The memos remained posted for several
    weeks inside the roll-call room until the media began inquiring.

e.  Responding to a query from a civilian who was cited on consecutive days in
    November of 2009 for allegedly occupying more than one seat on the New York
    City subway, the officer responded: "Recently we've been told to write tickets
    instead of give warnings for this type of thing." The officer explained that they
    needed to meet quotas.

f.  In December of 2010 and in response to the pressure from their supervisors to write
    baseless summonses pursuant to the policy and practice of "quotas," police officers
    at the 79th Precinct considered organizing a so-called "daylong summons boycott."
    As one (1) officer at the precinct explained, "Nobody feels this is right, asking us
    to write summonses just to meet a quota."

g. In response to the planned summons-boycott at the 79th Precinct, on December 13, 2010, Deputy Chief Michael Marino marched into the precinct at roll call with a deputy inspector and read officers the riot act. "Just try it," a police source quoted Marino as saying. "I'll come down here and make sure you write them." Marino also vowed to transfer people, like he did when he was the commanding officer of the 75th Precinct in East New York.

h. Capt. Alex Perez, the second in command at the NYPD's 81st Precinct, testified in a civil matter before a Brooklyn Supreme Court jury that officers are likely to get poor performance ratings if they have few arrests, conceding that that arrest numbers are a factor in evaluating an officer's performance. Ultimately the jury in case ruled that the police had a policy "regarding the number of arrests officers were to make that violated plaintiff's constitutional rights and contributed to her arrest."

i. The New York City Office of Collective Bargaining concluded that officers in Brooklyn's 75th Precinct were required to issue four (4) parking tickets, three (3) moving violation citations, three (3) "quality-of-life" summonses, make one (1) arrest and two (2) stop-and-frisks each month. Arbitrator Bonnie Siber Weinstock ruled that the NYPD maintained an illegal "summons quota for traffic violations in the precinct and by penalizing officers for failing to meet the stated number of traffic citations." She ordered the city to cease and desist from the practice.

j. Kieran Creighton, commander of the NYPD Housing Police Service Area 8 in the northern Bronx, was investigated for ordering officers to make a certain number of arrests each month. According to The New York Daily News:

The incident allegedly occurred in the spring when Creighton ordered at least eight members of an undercover anti-crime team to a meeting in Pelham Bay Park to berate them about an alleged lack of arrests, sources said.

"You can't make the nine collars a month, then we'll all have to go our separate ways," Creighton told the officers, according to an internal complaint obtained by The News.

Anything less than nine arrests would be a "personal slap in the face," Creighton allegedly said.

Creighton then told the cops to "finagle" the times of arrests so any overtime was paid for by a federally funded anti-drug program, the complaint alleges. Unbeknownst to Creighton, one officer had his NYPD radio switched on - so the captain's 10 to 12 minute speech was broadcast to Bronx precincts in Morrisania and Schuylerville and taped by a 911 dispatcher

108.    The existence of the aforesaid unconstitutional customs and practices, **specifically with regard to the failure to supervise, train, instruct and discipline police officers and encouraging their misconduct**, are further evidenced, inter alia, by the following:

a. The Report of the Commission to Investigate Allegations of Police Corruption and the Anti-Corruption Procedures of the Police Department ("Mollen Commission Report"), dated July 7, 1994, states:

> In the face of this problem [of corruption], the [NYPD] allowed its systems for fighting corruption virtually to collapse. It has become more concerned about the bad publicity that corruption disclosures generate that the devastating consequences of corruption itself. As a result, its corruption control minimized, ignored and at times concealed corruption rather than root it out. Such an institutional reluctance to uncover corruption is not surprising. No institution wants its reputations tainted – especially a Department that needs the public's confidence and partnership to be effective. A weak and poorly resources anti-corruption apparatus minimizes the likelihood of such taint, embarrassment and potential harm to careers. Thus there is a strong institutional incentive to allow corruption efforts to fray and lose priority – which is exactly what the Commission uncovered. This reluctance manifested itself in every component of the Department's corruption controls from command accountability and supervision, to investigations, police culture, training and recruitment. For at least the past decade, the system designed to protect the Department from corruption minimized the likelihood of uncovering it.

b. Accordingly, in 1990, the Office of the Special Prosecutor, which investigated charges of police corruption, was abolished.

c. In response to the Honorable Judge Weinstein's ruling of November 25, 2009 in Colon v. City of New York, 09-CV-00008 (E.D.N.Y.), in which he noted a "widespread... custom or policy by the city approving illegal conduct" such as lying under oath and false swearing, Commissioner KELLY acknowledged, "When it happens, it's not for personal gain. It's more for convenience."18

d. Regarding defendant CITY's tacit condonement and failure to supervise, discipline or provide remedial training when officers engage in excessive force, the Civilian Complaint Review Board is a CITY agency, allegedly independent of the NYPD, that is responsible for investigating and issuing findings on complaints of police abuse and 19 misconduct. When it does, however, Police Commissioner KELLY controls whether the NYPD pursues the matter and he alone has the authority to impose discipline on the subject officer(s). Since 2005, during KELLY's tenure, only one- quarter of officers whom the CCRB found engaged in misconduct received punishment more severe than verbal "instructions." Moreover, the number of CCRB- substantiated cases that the NYPD has simply dropped (i.e., closed without action or discipline) has spiked from less than 4% each year between 2002 and 2006, to 35% in 2007, and approximately 30% in 2008. Alarmingly, the NYPD has refused to prosecute 40% of the cases sent to it by the CCRB in 2009. As a result, the percentage of cases where the CCRB found misconduct but where the subject officers were given only verbal instructions or the matter was simply dropped by the NYPD rose to 66% in 2007. Substantiated complaints of excessive force against civilians accounted for more than 10% of the cases that the NYPD dropped in 2007 and account for more than 25% of cases dropped in 2008.

109.    The existence of the aforesaid unconstitutional customs and practices, **specifically with regard to the practice or custom of officers lying under oath, falsely swearing out criminal complaints, or otherwise falsifying or fabricating evidence**, are further evidenced, inter alia, by the following:

a.  The Mollen Commission concluded that police perjury and falsification of official records is probably the most common form of police corruption facing the criminal justice system. It concluded:

> Regardless of the motives behind police falsifications, what is particularly troublesome about this practice is that it is widely tolerated by corrupt and honest officers alike, as well as their supervisors. Corrupt and honest officers told us that their supervisors knew or should have known about falsified versions of searches and arrests and never questioned them.
> […]
> What breeds this tolerance is a deep-rooted perception among many officers of all ranks within the Department that nothing is really wrong with compromising facts to fight crime in the real world. Simply put, despite the devastating consequences of police falsifications, there is a persistent belief among many officers that it is necessary and justifies, even if unlawful. As one dedicated officer put it, police officers often view falsification as, to use his words, "doing God's work" – doing whatever it takes to get a suspected criminal off the streets. This attitude is so entrenched, especially in high-crime precincts, that when investigators confronted one recently arrested officer with evidence of perjury, he asked in disbelief, "What's wrong with that? They're guilty."

b.  In June of 2011, in the case in New York County Supreme Court entitled People v. William Eiseman (Ind. No. 2999-2010), NYPD Sergeant William Eiseman pled guilty to perjury and falsifying police records, "admit[ing] to faking a marijuana case against one man and cocaine-related charges against another – and training young [officers] to falsify paperwork to sidestep legal safeguards." Supreme Court Justice Juan Merchan commented that Sgt. Eiseman's admissions "paint a picture of a police officer who has challenged and undermined the integrity of the entire system we have here."

c.  In late 2009, a former NYPD officer in the Bronx, Pedro Corniel, was charged with perjury for claiming to have caught a burglar "red-handed," when, in fact, two other officers had made the arrest and handed the arrest off to Mr. Corniel. The suspect was 25 released. Moreover,

> Prosecutors and NYPD Internal Affairs probers have identified as many as two dozen cases in the past year in which cops allegedly made false statements involving routine arrests when the truth

would have served them just as well. That's a significant increase over previous years, sources said. "In the past, we'd find this happening once or twice a year, and now there are a bunch of them," said one law-enforcement official.

What has the authorities particularly troubled is that officers historically have lied to cover up more serious corruption, such as the cadre of Brooklyn narcotics cops caught last year stealing drugs from dealers and masking their thievery by filing false reports about what they had seized.

But internal probers are now finding that officers appear willing to take insidious shortcuts and lie on arrest reports when they are processing even routine collars, such as grand larceny, burglaries and robberies, sources told The Post.

Their reasons could range from trying to cut down on paperwork to being lazy when filling out arrest and incident reports.

d.  In early 2010, the CITY recently settled a civil rights lawsuit wherein one Officer Sean Spencer30 falsely arrested and accused a 41-year old grandmother of prostitution, promising to pay the woman $35,000. In court documents, Caroline Chen, the attorney representing the CITY in the case, admitted: "Officer Spencer falsely reported to the assistant district attorney that he saw [the plaintiff] beckon to three male passersby and that he was aware that plaintiff was previously arrested for [prostitution] when the plaintiff had never been arrested for this offense."

e.  Separate grand jury investigations into drug-related police corruption in the Bronx and Manhattan revealed that more than a dozen officers had been breaking into drug dealers' apartments, stealing and then selling their drugs and perjuring themselves by filing false arrest reports. District attorneys and their assistants interviewed during a four-month investigation by New York Newsday said they believe those two grand jury investigations - in the 46th Precinct in the University Heights section of the Bronx and the 34th Precinct - are not isolated instances. They say the investigations reflect a larger, broader problem within the NYPD that its top officials seem unable or unwilling to acknowledge.

f.  In 2011, hundreds of New York City drug cases were dismissed after numerous police officers were accused of mishandling evidence. Justice Gustin L. Reichbach of the State Supreme Court in Brooklyn condemned the widespread culture of lying and corruption in the department stating, "this court was shocked, not only by the seeming pervasive scope of misconduct but even more distressingly by the seeming casualness by which such conduct is employed." (Michelle Alexander, *Why Police Lie Under Oath*, N.Y. Times, Feb. 2, 2013)

110.    The existence of the aforesaid unconstitutional customs and practices, **specifically**

**with regard to the practice or custom of discouraging police officers from reporting**

**the corrupt or unlawful practices of other police officers and of retaliating against officers who report misconduct**, are further evidenced, inter alia, by the following:

a. Former New York County District Attorney Robert Morgenthau has been quoted as acknowledging that, in the NYPD, there is a "code of silence," or a "code of protection" that exists among officers and that is followed carefully;

b. In 1985, former NYPD Commissioner Benjamin Ward, testifying before a State Senate Committee, acknowledged the existence of the "code of silence" in the NYPD;

c. Former NYPD Commissioner Robert Daly wrote in 1991 that the "blue wall of solidarity with its macho mores and prejudices, its cover-ups and silence, isreinforced every day in every way."

d. "The city doled out nearly $70 million last year alone to settle lawsuits against its litigation magnet police department, according to municipal data. The settlement surge was the result of roughly 1,400 lawsuits that were filed against the NYPD for alleged misconduct. The accusations include excessive use of force, assault, wrongful arrest and imprisonment and malicious prosecution. The checks the city signed in 2019 were for $30 million more than it paid out the year before for the same alleged offenses. This data does not include matters which were settled outside of court between New Yorkers and the city, which could amount to hundreds of individual cases or more, according to the Legal Aid Society of New York."

e. "Brooklyn District Attorney's Office examined 25 wrongful convictions and determined that prosecutorial and police misconduct contributed to a majority of them… The DA's Conviction Review Unit, which examines claims of innocence, investigated the 20 highlighted cases — leading to the exoneration of 25 defendants for crimes dating as far back as 1963. In 85 percent of them, the CRU determined that prosecutorial misconduct contributed to the wrongful convictions, according to the report. In 65 percent of the cases, the unit found that police misconduct led to the miscarriage of justice. All but one of the exonerees are people of color, the DA said."

111.    The existence of aforesaid unconstitutional customs and practices, specifically with regard to the practice or custom of officers arresting individuals even in the face of evidence to the contrary and without probable cause, are further evidenced, inter alia, by the following:

a. 5 Borough Pawn, LLC v. City of New York, 08-CV-3837 (CM) (S.D.N.Y.) (police officer arrested pawnshop owner when he refused to let officers search the pawnshop's safe without a warrant; officer swore out a criminal complaint that did not mention the safe, but rather the refusal to show business records without a warrant which is false as the pawnshop owner offered such documents);

b. Sulkowska v. City of New York, 99-CV-4228 (AGS) (S.D.N.Y.) (police officer arrested owner of bar on the belief that the bar's liquor license was fraudulent despite being provided with both the original and photocopy of the license at the time of the arrest and without inquiring the New York State Liquor Authority as to the validity of the license; testimony and evidence at trial established that the liquor license was valid at the time of arrest and has never been suspended, revoked, or canceled);

c. Tretola v. County of Nassau, 08-CV-3225 (DRH) (WDW) (E.D.N.Y.) (police officer arrested owner of firearms business three weeks after date that officer had observed what he believed to be a fire code violation due to close proximity of a gas heater and bullet traps despite the heater being disconnected for over a decade; although plaintiff had stated "there is no gas in the pipe," he was arrested without any inquiry as to the operational status of the gas heater);

d. Cordero v. City of New York, 15-CV-3436 (E.D.N.Y.) (cashier alleges the street sale drug charges against him were trumped by police officers who wanted to make an arrest in order to receive overtime as the cashier never left his place of business that day and did not have any drugs on him);

e. Sash v. City of New York, 05-CV-1544 (DAB) (JCF) (S.D.N.Y.) (plaintiff alleges NYPD conspired to drive him out of his business by subjecting him to a false arrest based on a false complaint, false statements, and an excessive bail to keep him incarcerated); and

f. Gilliam v. Lynch et al, 1:21-CV-05263 (S.D.N.Y.) (three police officers falsely arrested and accused Shake Shack manager of intentionally poisoning the officer's milkshakes with bleach despite the milkshakes being packaged and sealed when the officers had arrived, video surveillance revealing nothing was added, the NYPD Emergency Service Unit testing the milkshakes and found no bleach or other toxic substance, and the officers were examined and released from the hospital without ever showing symptoms; with this information revealed, the NYPD Lieutenant still sent an email to the PBA and DEA to falsely inform them of the alleged incident, and the DEA and PBA president published tweets regarding the incident which received thousands of shares).

112. The existence of aforesaid unconstitutional customs and practices, specifically with regard to the practice or custom of officers arresting individuals for the intention of recruiting police informants, are further evidenced, inter alia, by the following:

a. According to documents obtained by the New York Times, along with interviews with former police officials, the NYPD Citywide Debriefing Team has combed the city's jails for Muslim immigrants in order to persuade them to become police informants. The Citywide Debriefing Team sought to recruit Muslims regardless of if they have crime information or not. These interviews have made Muslim immigrants feel as if they had little choice but to cooperate. Furthermore, Muslim immigrants have been arrested over offenses such as driving without a valid license or stealing a fountain pen. Once in a house cell or lock up facility, waiting

to be arraigned, these immigrants have been pulled aside and questioned by detectives. The questioning had nothing to do with the incident or charges against them, but rather questions regarding their religion and working as an informant. Once released, the charges have been dropped. The Citywide Debriefing Team has dated to at least 2004. (Joseph Goldstein, *New York Police Recruit Muslims to Be Informers*, N.Y. Times, May 10, 2014)

113.     The existence of the above-described unlawful de facto policies and/or well-settled and widespread customs and practices is known to, encouraged and/or condoned by supervisory and policy-making officer and officials of the NYPD and the CITY.

114.     The actions of the individual police defendant resulted from and were taken pursuant to the above-mentioned de facto policies and/or well-settled and widespread customs and practices of the CITY, which are implemented by members of the NYPD, of engaging in systematic and ubiquitous perjury, tampering of evidence, coercion, both oral and written, to cover-up federal law violations committed against civilians by either themselves or their fellow officers, supervisors and/or subordinates. They do so with the knowledge and approval of their supervisors and commanders who all: (i) tacitly accept and encourage a code of silence wherein police officers refuse to report other officers' misconduct or tell false and/or incomplete stories, inter alia, in sworn testimony, official reports, in statements to the CCRB and the Internal Affairs Bureau ("IAB"), and in public statements designed to cover for and/or falsely exonerate accused police officers; and (ii) encourage and, in the absence of video evidence blatantly exposing the officers' perjury, fail to discipline officers for "testifying" and/or fabricating false evidence to initiate and continue the malicious prosecution of civilians in order to cover-up civil rights violations perpetrated by themselves of fellow offices, supervisors and/or subordinates against those civilians.

115.    Defendant CITY knew or should have known that the acts alleged herein would deprive the plaintiff of his rights under the Fourth and Fourteenth Amendments to the United States Constitution.

116.    Defendant CITY is directly liable and responsible for the acts of the individual police defendant because it repeatedly and knowingly failed to properly supervise, train, instruct and discipline them and because it repeatedly and knowingly failed to enforce the rules and regulation of the CITY and NYPD, and to require compliance with the Constitution and laws of the United States.

117.    Despite knowledge of such unlawful de facto policies, practices and/or customs, these supervisory and policy-making officers and officials of the NYPD and the CITY, have not taken steps to terminate these policies, practices and/or customs, do not discipline individuals who engage in such polices, practices and/or customs, or otherwise properly train police officers with regard to the constitutional and statutory limits on the exercise of their authority, and instead sanction and ratify these policies, practices and/or customs through their active encouragement of, deliberate indifference to and/or reckless disregard of the effect of said policies, practices and/or customs upon the constitutional rights of persons in the City of New York.

118.    The aforementioned CITY policies, practices and/or customs of failing to supervise, train, instruct and discipline police officers and encouraging their misconduct are evidenced by the police misconduct detailed herein. Specifically, pursuant to the aforementioned CITY policies, practices and/or customs, the individual defendants felt empowered to arrest plaintiff without probable cause and then fabricate and swear to a false story to cover up their blatant violations of plaintiff's constitutional rights. Pursuant to the

aforementioned CITY policies, practices and/or customs, defendants failed to intervene in or report other defendants' violation of plaintiff's rights or subsequent perjury.

119.     Plaintiff's injuries were a direct and proximate result of the Defendant CITY and the NYPD's wrongful de facto policies and/or well-settled and widespread customs and practices and of the knowing and repeated failure of the defendant CITY and the NYPD to properly supervise, train and discipline their police officers.

120.     Defendants collectively and individually, while acting under color of state law, acquiesced in a pattern of unconstitutional conduct by subordinate police officers and were directly responsible for the violation of the plaintiff's constitutional rights.

121.     Defendant City is liable for the harms and losses sustained by Siddique for damages and for purposes of an injunctive relief.

**WHEREFORE**, Plaintiff demands judgment against the Defendants as follows: (1) For an amount to be determined at trial on all Causes of Action, (2) For Punitive and Exemplary damages, (3) For all costs of this action including reasonable attorneys' fees incurred by Plaintiff, (4) For such and other relief as may be just.

Dated: Brooklyn, NY
       October 24, 2022

_____/S/_____
DAVIS NDANUSA IKHLAS & SALEEM LLP
MUSTAPHA NDAUSA, ESQ.
26 Court Street, Suite 603
Brooklyn, NY 11242
718-783-6819
mndanusa@dnislaw.com